IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JARRETT HAMPTON, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:17-CV-299 |
| | § | |
| DR. EDGAR HULIPAS, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## **MEMORANDUM OPINION AND ORDER**

State inmate Jarrett Hampton (TDCJ #816800) filed a complaint under 42 U.S.C. § 1983 (Dkt. 1) alleging that he was denied adequate medical care in violation of his constitutional rights. The only claim that remains in this lawsuit is Hampton's allegation that Dr. Edgar Hulipas violated his rights under the Eighth Amendment by delaying his access to medical care by specialists for a chronic condition known as sarcoidosis (Dkt. 21). Hampton has filed an amended complaint concerning this allegation (Dkt. 23) and he has also provided a more definite statement of the facts in support of this claim (Dkt. 26). Dr. Hulipas has filed a motion for summary judgment (Dkt. 41). In response, Hampton has filed a declaration with exhibits (Dkt. 46), a brief in opposition (Dkt. 47), and a statement of "disputed factual issues" (Dkt. 48). After reviewing all of the pleadings, the parties' briefing, the exhibits, and the applicable law, the court will grant the defendant's motion and dismiss this case for the reasons that follow.

# I.   BACKGROUND

Throughout this lawsuit Hampton has been incarcerated by the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ") at the Darrington Unit in Rosharon (Dkt. 1, at 1).[1]  Dr. Hulipas is a physician employed by the University of Texas Medical Branch ("UTMB"), who works in the clinic located at the Darrington Unit (*Id.* at 3).  As detailed more fully below, Hampton contends that Dr. Hulipas violated his rights by delaying his access to treatment by specialists with the dermatology department at the UTMB Hospital in Galveston, which provides care for state inmates confined in TDCJ through a variety of specialty clinics.

## A.   Records of Hampton's Medical Care

Dr. Hulipas has provided records of the medical care that Hampton received during the period of time relevant to this lawsuit (Dkt. 42-1, at 3-105). He has also provided an affidavit from Dr. Steven Bowers, who is employed by UTMB (Dkt. 42-3, at 2-7), which summarizes those records in chronological order (*Id.*, at 8-98). Hampton has also provided medical records with his response to the motion for summary judgment (Dkt. 46, Exhibits 1-8) which duplicate many of those provided by the defendant.

---

[1] Unless otherwise indicated, all page numbers reference the pagination imprinted on each docket entry by the court's electronic filing system, CM/ECF.

The medical records show that on October 17, 2014, Hampton was seen for a follow-up appointment with an otolaryngologist at the UTMB Hospital Ear Nose and Throat ("ENT") Department, where he was receiving treatment for problems associated a chronic sinus infection and a history of "left sided nasal obstruction" that was the result of "nasal trauma" sustained by Hampton "7-8 years ago" (Dkt. 46-8, at 2, 4-5). At some point, a provider authorized endoscopic surgery to correct Hampton's deviated septum, which was scheduled to take place on January 8, 2015 (Dkt. 46-1, at 3). The procedure could not be performed as scheduled, however, because the surgeon (Dr. Paul Brindley) noted that Hampton had what appeared to be an acute staph infection affecting his columella, which is the bridge or column separating the nostrils at the cleft of the upper lip (Dkt. 42-3, at 14). Those symptoms were treated with antibiotics and steroids (*Id.*).

When the symptoms of infection persisted, the ENT department ordered a biopsy of the affected area on May 19, 2015 (*Id.* at 17). Because Hampton's infection implicated the skin around his nose, he was referred for an examination by a specialist in dermatology (*Id.* at 14).

On November 17, 2015, Dr. Rebecca Phillips examined Hampton at the UTMB Hospital Dermatology Department for what was described as a "rash on [his] nose" (Dkt. 42-3, at 17). After considering Hampton's history of nasal trauma, Dr. Phillips observed that his symptoms were consistent with a diagnosis of sarcoidosis (*Id.* at 17-20).

Dr. Bowers explains that "[s]arcoidosis is a disease characterized by the growth of tiny collections of inflammatory cells (granulomas)," which can occur in any part of the body, but appear "most commonly [in] the lungs and lymph nodes" (Dkt. 42-3, at 6). According to Dr. Bowers, sarcoidosis can also affect "the eyes, skin, heart and other organs" (*Id.*). The symptoms, which consist of inflammation or lesions on the affected tissues, can be relieved with medication, but there is no known cure for sarcoidosis (*Id.*). Although there is no known cure, Dr. Bowers notes that "in many cases, it goes away on its own" (*Id.*).

During her initial evaluation on November 17, 2015, Dr. Phillips ordered further tests of the specimen collected during the biopsy on May 19, 2015, to confirm the diagnosis of sarcoidosis and to determine whether there was "systemic involvement" (Dkt. 42-3, at 20). Additional tests, which were completed on November 17, 2015, included chest x-rays, an EKG, urinalysis, CBC, and a complete metabolic panel (*Id.*). Hampton was also scheduled for an eye examination and pulmonary function test at a later date (*Id.* at 23).

On November 30, 2015, Dr. Phillips confirmed that the specimen taken from the biopsy of Hampton's left nasal vestibule on May 19, 2015, was consistent with the diagnosis of sarcoidosis, but determined from his other test results that the disease was limited to the skin around his nose and that there was no evidence of systemic involvement (Dkt. 42-3, at 23). Dr. Phillips reviewed the expected course of treatment and management options for sarcoidosis of the skin with Hampton's "unit provider" by telephone (*Id.*). The parties do not dispute that Dr. Hulipas was

Hampton's unit provider and that he is the one who spoke with Dr. Phillips on this occasion. According to her proposed plan of care, Dr. Phillips prescribed a topical steroid (fluocinonide 0.05% cream) to be applied to the affected area on Hampton's nose (*Id.*). If there was "no response" to the topical cream, Dr. Phillips recommended considering "intralesional kenalog" treatment (*Id.*). If there was "still no response," then the plan was to consider another steroid, such as "hydroxychloroquine" (*Id.*). Dr. Phillips recommended a follow-up appointment for Hampton at the dermatology department in three months (*Id.*).

On December 1, 2015, a nurse practitioner met with Hampton at the Darrington Unit clinic and reviewed the plan of care that was proposed by Dr. Phillips to treat sarcoidosis of the skin (Dkt. 42-3, at 26). Consistent with the proposed treatment plan, Hampton was given a prescription for fluocinonide cream with instructions to apply a thin layer to the affected area twice a day (*Id.* at 27). Dr. Hulipas approved the treatment that was dispensed by the nurse practitioner (*Id.*).

On December 3, 2015, Hampton saw Dr. Hulipas in the clinic for a follow-up appointment at the Darrington Unit clinic (Dkt. 42-3, at 29-30). Dr. Hulipas noted that Hampton was "doing fine" and discussed Hampton's lab results as well as the prescribed medication regimen (*Id.*).

On December 10, 2015, Hampton submitted a "sick call request" to the clinic at the Darrington Unit, requesting a refill for "saline nasal spray" and to find out when he was scheduled to return to the UTMB Hospital in Galveston (Dkt. 42-3,

at 32). That same day, Dr. Hulipas approved the requested refill and advised Hampton that appointments with both the ENT and Dermatology departments were pending (*Id.*).

On January 19, 2016, Hampton returned to the ENT department for a follow-up visit with an otolaryngologist regarding his chronic sinus issues and history of nasal obstruction (Dkt. 42-3, at 38-40). Hampton reported that he had been using saline spray to treat nasal dryness and noted that he had a sore throat (*Id.* at 38). After strep throat was ruled out, the treating physician prescribed Claritin, Nasilide nasal spray, and saline nasal spray as needed to treat Hampton's symptoms (*Id.* at 40). After discussing his symptoms, the treatment provider recommended further deferring surgery to correct Hampton's deviated septum until after the inflammation around his nose was resolved (*Id.* at 39).

On January 21, 2016, Hampton submitted a sick-call request asking for the medication recommended by the ENT department (Dkt. 42-3, at 45). Dr. Hulipas noted that the prescription for Claritin had been ordered, but that Nasilide nasal spray and another prescription for the antibiotic Levaquin required a non-formulary request (*Id.*). Dr. Hulipas submitted the non-formulary requests, which were approved by the prison pharmacy that same day (Dkt. 42-3, at 46-47).

On March 1, 2016, Hampton attended a follow-up appointment at the hospital in Galveston with Dr. Alison Lowe of the dermatology department (Dkt. 42-3, at 51-56). Dr. Lowe noted "significant improvement" in Hampton's "nasal lesion" with the topical cream that had been prescribed by Dr. Phillips on

November 30, 2015 (*Id.* at 51). Hampton reported that he previously experienced an episode of dizziness and chest pain, but Dr. Lowe noted that his most recent EKG was "within normal limits" (*Id.*). The results of a recent pulmonary-function test, which was performed on January 25, 2016, were also normal (*Id.* at 54). Dr. Lowe elected to continue Hampton's treatment with fluocinonide 0.05% cream and recommended a routine follow-up visit to the dermatology department in six months (*Id.* at 54-55). With regard to Hampton's complaints of chest pain, Dr. Lowe noted that arrhythmia was a concern due to his diagnosis of sarcoidosis, but that he was currently "asymptomatic" (*Id.* at 55). She advised Hampton that "should symptoms [of chest pain] recur," he should alert his unit physician immediately to determine whether an EKG or referral to the cardiac department was warranted (*Id.*).

On April 22, 2016, Hampton returned to the UTMB Hospital in Galveston for a follow-up examination for his persistent sinus issues by an otolaryngologist at the ENT department (Dkt. 42-3, at 60). The examining physician noted that Hampton continued to receive treatment in the form of a topical steroid cream for inflammation on his nose caused by sarcoidosis (*Id.*). He noted "a recent flair [*sic*]" of Hampton's symptoms of inflammation, but that those symptoms were "currently resolving" (*Id.*) The physician observed inflammation on Hampton's columella and upper lip, which were consistent with his diagnosis of sarcoidosis (*Id.* at 61). He also observed "mucosal inflammation" at the juncture of the hard and soft palate of Hampton's mouth (*Id.*). Hampton denied having any "pain in

these lesions" (*Id.* at 60).  The ENT specialist continued Hampton's prescription for Nasilide nasal spray and scheduled a routine follow-up appointment in six months (*Id.* at 62).

On May 31, 2016, Hampton submitted a sick-call request to medical providers at the Darrington Unit, advising that he had sarcoidosis and that he had "developed lesions on the bridge of [his] nose and the back of [his] head" (Dkt. 42-3, at 65).  Hampton stated that the "medication" he had been prescribed previously was "not working," that his lymph nodes were "swelling," and that "other lesions" were starting to appear (*Id.*).  Hampton noted that he also had a lesion in his mouth that could not be treated "topically" and he feared that his condition was beginning to "spread rapidly" (*Id.*).  Noting further that he had a follow-up appointment scheduled with the dermatology department in September, Hampton asked unit providers to "notify" the UTMB Hospital of the changes in his condition and to "recommend [an] early visit" (*Id.*).  Dr. Hulipas received the request and responded the same day, advising Hampton to keep his upcoming appointment, which was scheduled for September 2016 (*Id.*).

On June 22, 2016, Hampton submitted a sick-call request for a refill of his prescription for loratadine (Claritin) for allergies and associated sinus problems (Dkt. 42-3, at 67).  The request was approved by a nurse practitioner and the prescription was refilled that same day (*Id.*).

On July 19, 2016, Hampton submitted a sick-call request for a refill of Nasonex nasal spray (Dkt. 42-3, at 69).  Dr. Hulipas submitted a non-formulary

request for this medication, which was approved by the pharmacy that same day (*Id.* at 69-71).

Hampton made no further requests for care or complaints to the medical department about symptoms of sarcoidosis until August 10, 2016, when he submitted another sick-call request, advising that "as of lately" he had been experiencing "some pain" around his "nose area" (Dkt. 42-3, at 73). Hampton added that the bridge or column between his nostrils was "separating from [his] face" (*Id.*). Hampton also noted that he had been having "nose bleeds and puss [*sic*] running down from the area" (*Id.*). Fearing that his sarcoidosis was "spreading" and that he lacked the proper medication to "slow down this progression," Hampton asked officials to contact his dermatologist so that he could begin a different form of treatment with "interkelog therapy" (*Id.*).

On August 11, 2016, Hampton was examined by a medical provider at the Darrington Unit clinic in response to his sick-call request (Dkt. 42-3, at 74).[2] The provider who treated Hampton on that occasion observed "inflammation" on Hampton's "columella where it meets the philtrum" or cleft of his upper lip (Dkt. 42-3, at 74). During that examination Hampton was advised to keep his upcoming appointment with the dermatology department, which was scheduled for September 6, 2016 (*Id.*). The provider also continued Hampton's prescription for

---

[2] Although the record of the examination is signed by Dr. Hulipas and Nurse Annette Jackson (*Id.* at 75), Hampton insists that he was examined by Nurse Practitioner Terry Speer and did not see Dr. Hulipas that day (Dkt. 46, at 5 ¶ 15).

fluocinonide 0.05% cream and prescribed an antibiotic (sulfamethoxazole tablets) for ten days (*Id.* at 75).

On August 22, 2016, Hampton submitted a sick-call request, asking for a refill of his saline nasal spray (Dkt. 42-3, at 78). Dr. Hulipas granted that request for a refill the same day (*Id.* at 78-79).

On September 6, 2016, Hampton attended his scheduled appointment with the dermatology department and was seen by Dr. Elizabeth D. Schepp (Dkt. 42-3, at 81-84). Hampton reported that "in May or June" he noticed a "new bump on the roof of his mouth and on his left forehead," which had "continued to grow in size" and were "[s]ometimes painful" (*Id.*). Dr. Schepp observed that he also had a "new bump on [his] right upper cutaneous lip and his nasal lesions seem[ed] to be spreading" (*Id.*). Hampton had no other "skin complaints" that day (*Id.*), but Dr. Schepp observed "pink annular plaques with small areas of erosion" near the border between the hard and soft palates on the roof of Hampton's mouth (*Id.* at 82). She also observed a small area of "indurated red-brown papules and plaques without scale" on the back of Hampton's head and a small, but "[f]irm round dermal/subcutaneous nodule without overlying epidermal change" on his left forehead (*Id.* at 83). She discussed Hampton's treatment options, which included continuing with a topical fluocinonide cream, interkelog therapy, or "PO steroids" (*Id.*). She advised him to continue using topical cream for his lesions and prescribed additional treatment with the steroids Prednisone and Plaquenil for the flare of his cutaneous sarcoidosis (*Id.* at 83-84). Dr. Hulipas approved the

prescriptions recommended by Dr. Schepp on September 8, 2016 (Dkt. 42-3, at 86-88).

On September 20, 2016, Hampton returned to the dermatology department for a follow-up examination with Dr. Schepp (Dkt. 42-3, at 90). Hampton reported that his lesions "seem[ed] to be getting better" although he admitted that he was not using the topical cream prescribed by Dr. Schepp because he was "not sure" he should use it at the same time as the Prednisone and other medication that she had previously prescribed (*Id.*). Dr. Schepp noted that his skin lesions were "much improved" and that the "oral lesion" in his mouth was "mildly improved" (*Id.* at 92). Dr. Schepp decreased the dosage of Prednisone and scheduled Hampton for another follow-up examination by telemedicine in one month, noting that the oral lesion may need a biopsy by the ENT department if it had not improved by then (*Id.* at 92-93).

On October 19, 2016, Hampton had a telemedicine appointment with Dr. Chinelo Ikpeama of the dermatology department (Dkt. 42-3, at 96). Hampton advised that all of his lesions seemed to be getting better and that he was using the topical cream "with good result" (*Id.*). Dr. Ikpeama further decreased Hampton's prescription for Prednisone to "taper off" that medication as his skin lesions continued to improve (*Id.* at 97). Hampton was given another follow-up appointment by telemedicine the following month (*Id.* at 97-98).

## B.     The Plaintiff's Claims and Defendant's Arguments

Hampton filed his civil-rights complaint in this case on October 6, 2017, complaining primarily that Dr. Brindley denied him adequate medical care for his deviated septum when he cancelled the surgery on January 8, 2018 (Dkt. 1, at 3, 4; Dkt. 1-1, at 1).  Hampton's claims against Dr. Brindley were dismissed with prejudice and severed from this case in a memorandum opinion and order entered on July 27, 2018 (Dkt. 21).  A final judgment on those claims was also entered that same day (Dkt. 22).

Hampton also alleged that Dr. Hulipas violated his constitutional rights by failing to conduct a physical evaluation of his symptoms of sarcoidosis after Hampton submitted his sick-call request on May 31, 2016, before advising Hampton to keep his previously scheduled appointment with the dermatology department (Dkt. 1-1, at 1-2; Dkt. 26, at 17).  Noting that he was not seen by a specialist in the dermatology department until September 6, 2016, Hampton contends that Dr. Hulipas acted with "negligence" by failing to immediately refer him to a specialist, which delayed his access to care for symptoms of sarcoidosis that had "aggressively progressed" (Dkt. 23, at 11).  Hampton seeks unspecified compensatory and punitive damages from Dr. Hulipas under 42 U.S.C. § 1983 for violating his rights under the Eighth Amendment (*Id.* at 14).

Asserting qualified immunity, Dr. Hulipas moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Specifically, Dr. Hulipas contends that he did not violate Hampton's constitutional rights by disregarding a

serious risk to Hampton's health and that the delay in seeing a specialist did not cause substantial harm or pose a violation of the Eighth Amendment, which is a prerequisite for establishing a claim under 42 U.S.C. § 1983 (Dkt. 41, at 10-18).

## II.  <u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Under the well-established summary-judgment standard, a fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-movant to go beyond the pleadings and provide "specific facts showing the existence of a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted).

A reviewing court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment[.]" *Smith v. Regional Trans. Auth.*, 827 F.3d 412, 417 (5th Cir. 2016).  However, a non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable

inferences, unsubstantiated assertions, and legalistic argumentation." *Jones v. Lowndes Cnty., Miss.*, 678 F.3d 344, 348 (5th Cir. 2012) (citations and internal quotation marks omitted). In other words, the non-movant's burden is not met by the manufacture of "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S at 586; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (stating that a non-movant cannot demonstrate a genuine issue of material fact with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence) (citations and internal quotation marks omitted).

The court is mindful of the fact that the plaintiff proceeds *pro se* in this case. Courts are required to give a *pro se* litigant's contentions, however inartfully pleaded, a liberal construction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (noting that allegations in a *pro se* complaint are held to less stringent standards than formal pleadings drafted by lawyers). The traditional standard of leniency toward *pro se* pleadings, however, does not excuse a *pro se* plaintiff from "the burden of opposing summary judgment through the use of competent summary judgment evidence." *Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trustees*, 709 F. App'x 243, 246 (5th Cir. 2017) (per curiam) (citing *Davis v. Fernandez*, 798 F.3d 290, 293 (5th Cir. 2015) ("Of course, this is not to say that *pro se* plaintiffs don't have to submit competent evidence to avoid summary judgment, because they do.")).

## III.  DISCUSSION

Dr. Hulipas has moved for summary judgment on the issue of qualified immunity,[3] which is "an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  The doctrine of qualified immunity shields public officials acting within the scope of their authority from claims for monetary damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.* at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Carroll v. Carman*, 574 U.S. 13, 17 (2014) (reversing a decision that denied qualified immunity).

A plaintiff seeking to overcome qualified immunity must satisfy a two-prong inquiry by showing: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Al-Kidd*, 563 U.S. at 735 (citation omitted).  "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citations and internal quotation marks omitted).  "The

---

[3] The district court previously dismissed Hampton's claims against Dr. Hulipas in his official capacity as a state employee (Dkt. 21, at 11).

plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Id.* at 654 (quoting *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)). "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Id.* (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

Hampton contends that Dr. Hulipas is liable under 42 U.S.C. § 1983 for violating his constitutional rights under the Eighth Amendment, which prohibits cruel and unusual punishment. Dr. Hulipas argues that he is entitled to qualified immunity and dismissal of the complaint against him because Hampton does not demonstrate that a violation of the Eighth Amendment occurred. To prevail on a claim in this context a prisoner must demonstrate that a prison medical provider has acted with "deliberate indifference" to a "serious medical need" in a manner that constitutes "the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation and internal quotation marks omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (emphasizing that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment") (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1988)). To establish the requisite deliberate indifference under the Eighth Amendment a prisoner must show that the defendant was both (1) aware of facts from which an inference of an excessive

risk to the prisoner's health or safety could be drawn, and (2) subjectively drew an inference that such potential for harm existed. *See Farmer*, 511 U.S. at 837; *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (reciting the deliberate-indifference standard articulated in *Farmer*).

The Eighth Amendment's deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A failure to act "unaccompanied by knowledge of a significant risk of harm" is insufficient to establish a constitutional violation. *Farmer*, 511 U.S. at 837-38. It is not enough to identify a significant risk that the official "should have perceived but did not." *Id.* at 838. "Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent" do not amount to deliberate indifference. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). A showing of deliberate indifference to medical needs requires the prisoner to submit evidence that prison medical providers "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citation and internal quotation marks omitted). The Fifth Circuit has further emphasized allegations of "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that *results in substantial harm.*" *Rogers v. Boatright*, 709 F3d 403, 410 (5th Cir. 2013) (emphasis in original)

(quoting *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006)); *see also Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

Hampton contends that Dr. Hulipas violated the Eighth Amendment by not requesting an immediate referral for an appointment with the dermatology department when Hampton submitted his sick-call request on May 31, 2016. Instead, Dr. Hulipas advised Hampton to wait for his scheduled appointment on September 6, 2016, without conducting a physical examination before he determined that Hampton could wait to see a specialist. Hampton accuses Dr. Hulipas of "negligence" and alleges that his symptoms of sarcoidosis "aggressively progressed" as a result of the delay (Dkt. 23, at 11).

Allegations of negligence or medical malpractice are not sufficient to establish a violation of the Eighth Amendment and are not actionable under 42 U.S.C. § 1983. *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001) (observing that "mere negligence in failing to supply medical treatment" is insufficient to establish deliberate indifference) (citations omitted); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (per curiam) (stating that allegations of "[m]ere negligence, neglect or medical malpractice" do not give rise to a cause of action under 42 U.S.C. § 1983).

The medical records do not support a claim that Dr. Hulipas was negligent or that he intentionally disregarded a serious risk of harm when he reviewed the

sick-call request submitted on May 31, 2016, and determined that Hampton could wait to be seen until his scheduled appointment in September.  In his sick-call request of May 31, 2016, Hampton complained of skin lesions and other symptoms he feared were spreading because his medication was "not working" (Dkt. 42-3, at 65).  When considering that sick-call request, Dr. Hulipas was aware of Hampton's diagnosis of sarcoidosis of the skin without systemic involvement and the recommended plan of treatment, which consisted of applying topical cream to the affected area (Dkt. 42-3, at 29-30).  Dr. Hulipas was also aware that Hampton was being followed for his condition by specialists with both the ENT dermatology departments, who had examined Hampton in the months preceding the sick-call request submitted on May 31, 2016, and determined that Hampton's condition was responding to treatment with topical cream.

The medical records confirm that Hampton was seen by the dermatology department on March 1, 2016, where the specialist observed that his symptoms were responding to the topical cream and that he did not need to return for six months.  Hampton has alleged that he was told to notify unit providers of any "new abnormal changes" in his condition to obtain "an earlier Dermatology visit before September, 2016" (Dkt. 1-1, at 1). However, he provides no competent summary-judgment evidence in support of this contention.  As Dr. Bowers notes, the records contain no instruction from the specialist that Hampton return to the dermatology department sooner if his skin lesions flared up (Dkt. 42-3, at 6).  Rather, the treatment notes from Hampton's examination reflect that the specialist was more

concerned about symptoms of heart arrhythmia, which did not recur (Dkt. 42-3, at 55). Apart from these concerns, the specialist indicated that Hampton did not need to return to the dermatology department until September (*Id.*). Hampton's sick-call request of May 31, 2016, did not include complaints of chest pain or heart palpitations of the sort identified as a potential concern by the dermatologist who treated Hampton on March 1, 2016 (Dkt. 42-3, at 65).

The medical records also confirm that Hampton saw a specialist with the ENT department on April 22, 2016 (Dkt. 42-3, at 60-63). The ENT specialist noted inflammation on the columella or bridge of Hampton's nose and the roof of his mouth, but also noted that Hampton did not complain of any pain from his skin lesions, which were "resolving" or responding to the topical cream (*Id.* at 60). Other than inflammation that was responding to the topical treatment, the records from this examination reflect no signs of worsening symptoms of sarcoidosis.

The sick-call request that Hampton submitted on May 31, 2016, which concerned skin lesions on the bridge of his nose and inside of his mouth, described symptoms similar to those observed by the specialist on that occasion and the ENT specialist on April 22, 2016. Medical records of care provided after May 31, 2016, support Dr. Hulipas's determination that Hampton could wait to keep his scheduled appointment in September and did not need an earlier referral. In that respect, the sick-call requests that Hampton submitted in June and July 2016, requested refills of allergy medicine and nasal spray, but made no mention of complications from sarcoidosis and contained no complaints of pain (Dkt. 42-3,

at 69). Hampton did not request for additional care from the medical department or mention of any pain or symptoms associated with sarcoidosis until he submitted a sick-call request on August 10, 2016 (*Id.* at 73).[4]

Hampton claims that by August 10, 2016, his nose was separating from his face and that a lay person could have seen that he needed an emergency referral to a specialist (Dkt. 47, at 29-30). The medical records do not support this allegation. The medical provider who examined Hampton at the Darrington Unit on August 11, 2016, treated him for inflammation on the bridge between his nostrils, but did not observe anything that warranted an expedited appointment with a specialist (Dkt. 42-3, at 74-75). As a result, the provider encouraged Hampton to keep his upcoming scheduled appointment with the dermatology department (*Id.*).

When Hampton was seen for his scheduled appointment with the dermatology department on September 6, 2016, the examining physician noted a flare of his condition that was isolated to several small nodules and skin lesions, but observed that there were no symptoms associated with progression of

---

[4] On June 5, 2016, Hampton filed a Step 1 Offender Grievance Form (#2016155022), claiming that Dr. Hulipas had delayed his access to care for a deviated septum, acute sinus infection, and sarcoidosis by failing to recommend an earlier appointment with the dermatology department in response to the sick-call request that he submitted on May 31, 2016. Dkt. 42-5, at 3. On June 28, 2016, the grievance investigator confirmed that Hampton had an upcoming appointment with a specialist and advised Hampton to submit another sick-call request if he had "any other medical issues[.]" *Id*. at 4. Hampton filed a Step 2 grievance to challenge that result on July 13, 2016. *Id*. at 6. The official who reviewed the Step 1 and Step 2 grievances responded on August 26, 2016, that unit providers have "no control over scheduling" appointments for specialists at the hospital in Galveston, but that Hampton had appointments scheduled with the dermatology department in September and with the ENT department in October. *Id*. at 6. There is no evidence that Dr. Hulipas was ever made aware of these grievances.

sarcoidosis to systemic involvement of any other organ and no signs supporting Hampton's claim that his nose was disfigured as the result of delay in receiving care for his chronic condition (*Id.* at 81-84). Records of the follow-up examination on September 21, 2016, confirmed no spread of the disease beyond Hampton's skin (*Id.* at 90-94).

In Dr. Bowers' opinion, Dr. Hulipas complied with UTMB policies and followed the appropriate standard of care when he determined on May 31, 2016, that an expedited appointment with the dermatology department was not needed (Dkt. 42-3, at 7). In making that determination, Dr. Hulipas confirmed that Hampton had an appointment with a specialist at the dermatology department that was scheduled for September. The medical records reviewed by Dr. Hulipas reflected that Hampton had been receiving care for his chronic condition and that the symptoms referenced in his sick-call request were substantially similar to those observed during his examination by specialists at the dermatology department on March 1, 2016, and the ENT department on April 22, 2016. Hampton did not complain of any pain from the lesions or heart arrhythmia that could indicate worsening symptoms of sarcoidosis. Viewing all of the facts in the light most favorable to Hampton, as non-movant, he does not raise a genuine issue of material fact demonstrating that Dr. Hulipas was aware of objective facts posing an excessive risk to Hampton's health when he considered the sick-call request on May 31, 2016, or that Dr. Hulipas subjectively drew an inference that such a risk

existed on that occasion, but deliberately disregarded that risk by failing to order an expedited referral to the dermatology department.

To the extent that Hampton disagrees with the determination that Dr. Hulipas made on May 31, 2016, that he could wait to see a specialist until September 6, 2016, a prisoner's disagreement or difference of opinion with a medical provider's judgment is not sufficient to state an actionable claim under the Eighth Amendment. *See Estelle*, 429 U.S. at 107 (explaining that a physician's decision that treatment is not indicated "is a classic example of a matter for medical judgment"). Even if the determination was mistaken, a claim of negligence or medical malpractice does not rise to the level of deliberate indifference or cruel and unusual punishment in violation of the Eighth Amendment. *See id.* at 106; *see also Domino*, 239 F.3d at 756 ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.") (citation omitted).

Because there is no evidence that Dr. Hulipas deliberately ignored a serious risk of harm by failing to request an earlier appointment with a specialist on May 31, 2016, Hampton's arguments are insufficient to raise a genuine issue of material fact on whether a constitutional violation occurred and he has not overcome Dr. Hulipas' entitlement to qualified immunity. Therefore, the defendant's motion for summary judgment will be granted and this case will be dismissed.

## IV.  CONCLUSION AND ORDER

Based on the foregoing, the court grants Dr. Edgar Hulipas' motion for summary judgment (Dkt. 42) and dismisses this case with prejudice.

The Clerk is directed to provide a copy of this memorandum opinion and order to the parties of record.

SIGNED at Galveston, Texas, on ____November 6th_____, 2019.

_____

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE